IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-02133-MSK-MJW

BETTY L. JOHNSON,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER,

    Defendant.

---

**ORDER GRANTING, IN PART, MOTION FOR SUMMARY JUDGMENT**

---

THIS MATTER comes before the Court on the Defendant's Motion for Summary Judgment **(#22),** to which the Plaintiff responded **(#27)** and the Defendant replied **(#36).** Having considered the same, the Court finds and concludes as follows.

### I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### II. Issue Presented

The Plaintiff, Betty Johnson, asserts two claims against the Defendant, the City and County of Denver, alleging discrimination on the basis of sex. Claim 1 alleges harassment and disparate treatment on the basis of sex. Claim 2 alleges retaliation.

The issue presented is whether a trial is required on any claim.

### III. Material Facts

Based upon the evidence submitted,[1] which the Court construes most favorably to the Plaintiff, the Court finds for purposes of this motion, only, that:

1. At all times pertinent to this action, Betty Johnson worked at the Denver County Jail as a deputy.

2. During an indeterminate period of time, greater than 1 year and inclusive of March and April 2004, Ms. Johnson worked under the supervision of Sergeant Anthony Sullivan and three other sergeants in building 22 of the jail. She worked with Mr. Sullivan less than 9 hours per week out of her 41.3 hour workweek. In turn, Mr. Sullivan worked under the supervision of Captain Daniel McKenrick.

3. According to Ms. Johnson, Mr. Sullivan "constantly" harassed her, made belittling comments about her in front of the inmates, and refused to back up her decisions. In her opinion, this created a dangerous work environment.

4. During her deposition, Ms. Johnson testified that Mr. Sullivan "made comments all the time about women," and said he made such comments "weekly" over a 2 to 3-year period. According to her testimony and to her affidavit, the specific comments she heard him make were:

   • He is a "male chauvinist pig."

---

[1] The City and County of Denver contends that the Court should disregard most of Ms. Johnson's exhibits because they are not competent evidence for purposes of Fed. R. Civ. P. 56(e). If the Court were to do so, it would also be required to disregard most of the City's exhibits on identical grounds. (*See* Exhibits A-2, A-4, A-5, A-6, A-8, A-9, A-10, A-11, A-12, A-14, A-16, A-17). Due to Ms. Johnson's apparent reliance on the exhibits submitted by the City and County of Denver to demonstrate the material facts, the Court opts to consider all of the evidence presented and deems all objections to the competency of the evidence to be waived.

- Women should not be deputy sheriffs.

- Women should not be allowed to vote.

- Women should not be allowed to drive.

- Women should stay at home.

- He wanted his wife to be "a good girl and do her wifely duties".

- He wanted to move to Brazil where women could not own property.

- Women work with their emotions during "their time of the month".

- A fight would not have broken out in the pod where Ms. Johnson was working if a man had been working there instead.

5. During her deposition and in her affidavit, Ms. Johnson identified four specific incidents, and one recurring circumstance, in which she felt that Mr. Sullivan did not back up her decisions:

   a. In March 2004, inmate James Lee aggressively pushed his door into Ms. Johnson. Mr. Sullivan disciplined the inmate, but told Ms. Johnson, in front of several inmates and officers, that she had made a mistake with regard to the type of discipline that could be imposed.

   b. In April 2004, Ms. Johnson was confronted by David Montanez, an aggressive inmate who used foul language towards her. As she tried to manage the situation, other inmates began to yell. She ordered the inmate "locked in," because he had slammed a deck of cards on a table, but Mr. Sullivan did not support her decision, did not listen to her side of the story, and refused to let her talk to the Captain about it.

Ms. Johnson wrote a report concerning the actions of Mr. Montanez. The Captain gave her until the end of her shift to complete the report, but Mr. Sullivan demanded that she give him a partial report before the end of her shift, yelled at her in front of three other officers about "disobeying an order", told her that he was overriding the Captain's order, then told her she was insubordinate and threatened to send her home.

Ms. Johnson then went into the Captain's office and asked to speak to her union representative. While the Captain talked to the representative, Mr. Sullivan ordered Ms. Johnson to return to her work station. When she told him that she wanted to talk to her union representative, Mr. Sullivan told her she was insubordinate.

c. On an unspecified date, Ms. Johnson confined Inmate Martinez to his cell for one hour. When she went to let him out, she found he had already left his cell. While she advised Mr. Sullivan of the situation, Mr. Martinez "flipped her off" and Mr. Sullivan laughed. Mr. Sullivan then told Ms. Johnson that she could not write a report on Mr. Martinez' conduct.

d. In June 2004, Ms. Johnson refused to give a razor to Inmate McCadd. Mr. McCadd wanted to write a grievance, and Mr. Sullivan gave him a blank grievance form.

e. After Ms. Johnson turned down the volume on the inmates' television sets, Mr. Sullivan would turn up the volume if the inmates requested it.

6. With regard to the incident involving Mr. Montanez, Deputy Ralph Bernal signed

a written statement that Mr. Sullivan was in a "state of rage", "on a rampage" and "completely out of control". Mr. Bernal also stated that in 25 years of working for the Denver Sheriff Department, he had "never seen such a display of unprofessional supervision[.]" Similarly, Deputy James Sanford described Mr. Sullivan in a written statement as "enraged" and stated that Mr. Sullivan's "behavior was embarassing and extremely unprofessional."

7. Mr. Bernal also stated that Mr. Sullivan does not like females in general, confessed to being a "male chauvinist pig", and once said "that female officers have no business working in building 22" or for the Sheriff Department. Similarly, Mr. Sanford stated that Mr. Sullivan made numerous comments "that women should not work in building 22 and they were the cause of the majority of problems in the building." During the Internal Affairs investigation, Officer Roger Colburn reported that Mr. Sullivan was condescending towards women, made negative comments about women, and had expressed the belief that women should be barefoot and pregnant.

8. Four other female employees reported difficulties with Mr. Sullivan. Charlene Schnelker, who also worked in building 22, prepared a written statement that she observed that Mr. Sullivan treated female officers less favorably than male officers in various respects, and this made her uncomfortable on a daily basis. Officer Gina Henley reported during the Internal Affairs investigation that she experienced problems with Mr. Sullivan because she is female, and that he made her feel uncomfortable. Officer Venita Ruybal reported during that same investigation that Mr. Sullivan did not support one of her decisions to discipline an inmate, and that he referred to women as "fucking [name]". Officer Delilah Lewis also reported during the investigation that Mr. Sullivan told her "that she runs her pod with too much emotion especially

5

during that time of the month" and once said "that women should not be working in a jail."

9. Ms. Johnson believed that Mr. Sullivan carried around her personnel file, which contained confidential information, and shared it with other employees of the Sheriff Department. She also believed that he told Mr. Colburn confidential information about what occurred during a June 2004 mediation meeting involving herself, Mr. Sullivan, and others. Ms. Johnson claimed no personal knowledge of the contents of the file carried by Mr. Sullivan, and identified no specific instance in which the file was shown to anybody. However, according to Mr. Colburn, Mr. Sullivan has stated that "he has personal files on everyone." Also, Ms. Ruybal told the Internal Affairs investigator that Mr. Sullivan was walking around with the file "telling everyone" it pertained "to the battle" between himself and Ms. Johnson.

10. In April 2004,[2] Ms. Johnson submitted a grievance complaining of sexual discrimination and harassment. The grievance was referred to Internal Affairs. At first, the City and County of Denver refused to move Mr. Sullivan and instead forced Ms. Johnson to continue working with him.

11. Ms. Johnson found working with him intolerable, so on June 15, 2004, she requested that she be transferred to building 20. She felt that she was forced to request the transfer. Major Gary Anderson denied her request and instead made accommodations so that Ms. Johnson did not have to work with Mr. Sullivan while her grievance was investigated.

12. On July 6, 2004, Mr. Anderson ordered Mr. Sullivan to have no further contact

---

[2] There are references in the pleadings to an April 12 grievance, but the exact date of the grievance is unclear. Page 1 of the grievance shows a date of April 11, but the last two pages show it was submitted to different people on April 19 and 28. It bears a partially-illegible date stamp of April 28. For purposes of this ruling, the Court refers to it, simply, as the April 2004 grievance.

with Ms. Johnson and advised that he no longer supervised her. The decision was also made to have Ms. Johnson work in another building – the main jail – whenever Mr. Sullivan was in building 22.

13. After July 6, 2004, there were two incidents in which Mr. Sullivan came to the main jail building and stood outside of the control center, where Ms. Johnson was working, and stared at her for several minutes while he was talking with Captain Minor. Ms. Johnson believes that Mr. Sullivan was trying to intimidate her.

14. On September 13, 2004, Mr. Anderson advised Ms. Johnson that because her complaint of discrimination was not "sustained" by Internal Affairs, she could make a new transfer request.

15. On September 22, 2004, Ms. Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division. This is the only EEOC charge she filed.

16. In her EEOC charge, Ms. Johnson claimed that she was subjected to continuing discrimination by her supervisor, Mr. Sullivan, in the form of sex discrimination and retaliation between July 28, 2003 and September 17, 2004. She complained that she was "subjected to different terms of conditions" of employment because of her sex, and Mr. Sullivan retaliated against her because she complained to her employer of sexual discrimination. She alleged that he made it clear that he did not believe women should be working at the jail, that he was "verbally abusive," that he "threatened" her, that he undermined her authority with the inmates, and that he engaged in a "campaign of retaliation" after she complained about his conduct to superior officers. She complained that he "apparently" showed her personnel file to other

deputies and discussed this personnel matter with them, that Internal Affairs did not investigate her complaint, and that Mr. Sullivan did not undermine the authority of male officers.  She identified five instances of his "harassment and retaliation":

> Sergeant Sullivan constantly undermines my authority with the inmates.  He puts me down and degrades me in front of the inmates because I am female.
>
> Sergeant Sullivan allows the inmates to talk to me any way they want and to disrespect me which creates a hostile work environment for me.
>
> Sergeant Sullivan had told me on many occasions that I can not write a Conduct Adjustment report on an inmate, instead he has ordered me to write an Incident Report.
>
> Sergeant Sullivan will move an inmate back to my pod after I have moved the inmate out for disrespecting me or for some other violation.
>
> On April 12, 2004, I was having a problem with a hostile inmate while working the three East Pod.  When I called Sergeant Sullivan to the pod he stated that he was not going to back or support me.  He made this statement where the inmate could over hear him.

17. Effective October 11, 2004, Ms. Johnson was reassigned to building 20 of the jail, at her request.  She made such request so that she would not longer have to work in the same building as Mr. Sullivan, because she felt he created a hostile and intimidating work environment.

18. For each deputy, a sergeant keeps what is called a PEPR book.  The PEPR book is a notebook in which the sergeant makes a monthly notation about the deputy's work.  According to Ms. Johnson, "I have received exceeds on my PEPRs since the day I started my job."  No evidence was presented of any negative entries in Ms. Johnson's PEPR book, although Ms.

Johnson testified that there were comments in the PEPR book she wanted to have removed.

19. Mr. Sullivan wrote PEPR entries for Ms. Johnson, but he never prepared her performance evaluations. Ms. Johnson reported that she has never received a performance evaluation of less than "exceeds expectations." According to Mr. McKenrick, Ms. Johnson's job performance was "rated strong", and he agreed with that rating.

20. While in building 20, Ms. Johnson's supervisor, Captain Robert Kricke, recommended in October 2005 that she attend some training classes to learn how to deal with inmates to aid her "professional development." According to Mr. Kricke, he made this recommendation based upon his, Sergeant Walters' and Sergeant Unger's observations of Ms. Johnson's interactions with the inmates in building 20, and notes in her PEPR book. Ms. Johnson complained of this recommendation in a workplace grievance.

### IV. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

9

for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V. Analysis

Although the claims alleged in the Complaint are a bit vague and are lumped into two, overarching claims of discrimination and retaliation, it is apparent that Ms. Johnson actually asserts three claims: (1) that Mr. Sullivan subjected her to a hostile work environment while she

worked in Building 22 under his supervision; (2) that Mr. Sullivan treated her differently than male employees while she worked in Building 22; and (3) that Mr. Sullivan retaliated against her for making complaints of discrimination to her employer. The City and County of Denver moves for summary judgment on all of Ms. Johnson's claims.[3]

## A. Hostile Work Environment Claim

To establish a *prima facie* hostile work environment claim based upon alleged sex discrimination, a plaintiff must present evidence that: (1) she was subjected to unwelcome harassment based on sex; (2) the conduct was severe or pervasive such that it altered a term, condition, or privilege of her employment; (3) because of the conduct, the plaintiff perceived her work environment to be abusive and felt that the conditions of her work environment were altered; and (4) a reasonable person would have found the conduct hostile or abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993); *Harsco Corp. v. Renner,* 475 F.3d 1179, 1186 (10th Cir. 2007).

In considering whether the conduct was severe or pervasive, "[f]actors to consider include the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harsco Corp.*, 475 F.3d at 1187. For purposes of pervasiveness, a plaintiff must do more than demonstrate that the defendant made occasional, offensive comments. Isolated instances of harassment do not rise to the level of pervasive

---

[3] In passing, the City and County of Denver references the defense recognized by the Supreme Court in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). However, the motion contains no meaningful analysis of *Faragher*, nor what is required to prove this defense. Thus, the Court does not address it.

11

conduct. *See Smith v. Northwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1414 (10th Cir. 1997). However, whether harassment is pervasive is contextual, and does not involve a numbers game in which the number of instances of harassing conduct are added together and measured against a bright-line standard. *Id.* at 1415. Instead, the number of instances of harassing conduct, their sequence and timing, and nuances of an environment are all relevant to the pervasiveness assessment. *Id.*

The City and County of Denver contends that Ms. Johnson cannot show she was subjected to severe or pervasive harassment because Ms. Johnson had minimal contact with Mr. Sullivan and the few statements he allegedly made did not amount to harassment. Ms. Johnson responds that Mr. Sullivan's actions were discriminatory, severe, pervasive, and altered the terms, conditions and privileges of her employment.

Construing the evidence in a light most favorable to Ms. Johnson, she has made a *prima facie* showing that Mr. Sullivan subjected her to severe and pervasive harassment based upon her sex, which she perceived, and a reasonable person would have found, altered the conditions of her work environment. She has identified numerous, sexist statements allegedly made by Mr. Sullivan. Although she offers no specifics as to when the statements were made or whether they were directed to her, she claims that she heard the statements on a weekly basis over a 2 to 3-year time period. She also offered evidence that Mr. Sullivan did not believe women should be working at the jail, and that he engaged in conduct which undermined her authority with the inmates. She has referred to four specific instances (three of which occurred between March and June 2004), and one general instance, in which this allegedly occurred. *Cf. Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (in which the employee claimed a hostile work environment and

12

alleged that her supervisory authority had been undermined due to her sex). This proffered evidence is sufficient for the hostile work environment claim to go to trial.

**B. Disparate Treatment Claim**

To establish a *prima facie* sex discrimination claim premised upon disparate treatment, a plaintiff must provide evidence that: (1) she is female; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) there are circumstances giving rise to an inference of unlawful discrimination. *Swackhammer v. Sprint/United Management Co.,* 493 F.3d 1160, 1166 (10th Cir. 2007). If she does so, then the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action, in accordance with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Id.* If the defendant does so, then the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *Id.*

The City and County of Denver contends that Ms. Johnson cannot establish that she suffered an adverse employment action. It also contends that even if there had been an adverse employment action, it did not occur in circumstances giving rise to an inference of discrimination. The City and County of Denver relies solely upon Ms. Johnson's inability to establish a *prima facie* claim, and thus has not offered a legitimate, nondiscriminatory reason for any adverse employment action.

In response, Ms. Johnson does not clearly explain what adverse employment action occurred. Instead, she points to the evidence pertaining to her interactions with Mr. Sullivan, and hints that his hostile conduct, his critical comments of her performance, her poor performance reviews, her transfer to Building 20, and Mr. Sullivan's sharing of her confidential

13

personnel file with others in the department constituted adverse employment actions. She also contends that Mr. Sullivan's actions belittling her in front of other inmates put her in danger.

The Tenth Circuit liberally defines the term "adverse employment action." *See Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir. 1998). However, not every unpleasant employment experience arises to the level of an adverse employment action. As the Tenth Circuit has repeatedly observed, Title VII does not prescribe a workplace civility code. *See Dick v. Phone Directories Co., Inc.,* 397 F.3d 1256, 1263 (10th Cir. 2005). Further, an employee's conclusory, untested opinion that he or she was harmed is insufficient to demonstrate an adverse employment action. *See Aquilino v. University of Kansas,* 268 F.3d 930, 935 (10th Cir. 2001).

Generally, to qualify as an adverse employment action, "the action must amount to 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or ... causing a significant change in benefits.'" *Stover v. Martinez,* 382 F.3d 1064, 1071 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). For instance, the transfer of an employee from one assignment to another, accompanied by only minor inconveniences such as a slightly longer commute, does not constitute an adverse employment action when there is no change in salary or benefits. *See Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 (10th Cir. 1998). Similarly, an employee's placement on a "performance improvement plan" following a poor performance evaluation is not, without more, an adverse employment action. *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1224 (10th Cir. 2006). By contrast, a disciplinary proceeding or letter of reprimand can constitute an adverse employment action, but only if it

14

affects the terms and conditions of the plaintiff's employment or affects future employment opportunities. *See Medina v. Income Support Div., New Mexico,* 413 F.3d 1131, 1137 (10th Cir. 2005).

No evidence was presented of any unfavorable performance evaluation or other similar type of evaluation which affected Ms. Johnson's pay, benefits, or other work conditions. Although there was evidence that Ms. Johnson was transferred to building 20, such evidence shows that the transfer was at her request. Even if she felt compelled to make the request, no evidence was presented that the working conditions in building 20 were more or less desirable than those in building 22, nor that the transfer affected her pay or benefits. As for allegations that Mr. Sullivan shared her confidential personnel file with others, there is no evidence as to what specific information he shared, with whom he shared it, or that such sharing of information affected the terms or conditions of Ms. Johnson's employment.

Arguably, Mr. Sullivan's alleged conduct undermining her authority in front of the other inmates could have been an adverse employment action if it created unsafe work conditions. In such circumstance, his conduct might have significantly altered the conditions of her employment. However, apart from Ms. Johnson's opinion that Mr. Sullivan's conduct had this effect, there is no evidence in the record to support it. For example, there is no evidence that any inmate harmed, or threatened to harm, Ms. Johnson because Mr. Sullivan had undermined her authority. Thus, because Ms. Johnson has not demonstrated an adverse employment action, her disparate treatment claim is dismissed.

## C. Retaliation Claim

To establish a *prima facie* retaliation claim, a plaintiff must provide evidence that: (1) she

engaged in protected opposition to discrimination; (2) an adverse action occurred which a reasonable employee would have found was materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *See Piercy v. Maketa,* 480 F.3d 1192, 1198 (10th Cir. 2007). If the plaintiff does so, then the defendant can rebut the *prima facie* case by articulating a "legitimate nondiscriminatory reason" for the adverse action. *Id.* The burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

Element 2 – that a reasonable employee would have found the challenged action materially adverse – is inclusive of, but broader than, the requirement of an adverse employment action for a disparate treatment claim. Instead, the terms, conditions, or status of employment do not need to be affected for there to be a materially adverse action. *See Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 61-67 (2006). Nevertheless, to be actionable, the retaliatory act must produce some injury or harm. *Id.* at 67-68. An action can be materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

The City and County of Denver concedes that the April 2004 grievance and EEOC charge constituted protected activities. It contends, however, that Ms. Johnson cannot demonstrate that any materially adverse employment action was taken against her, nor that there is any causal connection between an adverse action and a protected activity. As previously, its motion only challenges Ms. Johnson's ability to establish a *prima facie* claim, and it offers no legitimate, nondiscriminatory reason for the alleged adverse action.

Ms. Johnson responds that the retaliation consisted of: (1) the requirement that she attend

remedial classes on inmate supervision in the fall of 2005; (2) two instances during the summer of 2004 in which Mr. Sullivan tried to intimidate her; (3) the City and County of Denver's refusal to remove Mr. Sullivan from her work area after she submitted her April 2004 grievance, causing her to request reassignment to another building; and (4) Mr. Sullivan's attempt to share her personnel file with others.

It is a close call whether any of the alleged adverse actions could qualify as materially adverse actions. Assuming that they were, however, Ms. Johnson has failed to demonstrate any causal connection between her protected activity and an adverse action. She simply states that "it is clear that the adverse employment action and the filing of the sexual discrimination and sexual harassment complaint were connected." This conclusory statement is insufficient for her to meet her burden of estabishing a *prima facie* retaliation claim.

**IT IS THEREFORE ORDERED** that the City and County of Denver's Motion for Summary Judgment **(#22)** is **GRANTED** with regard to the disparate treatment and retaliation claims, but **DENIED** as to the hostile work environment claim.

Dated this 22nd day of August, 2008

            **BY THE COURT:**

            _____
            Marcia S. Krieger
            United States District Judge